Okay, we'll next call the case of in re Marriage of Cheryl Veile versus Roger Veile, 513-0499. Attorney for the Appellant, Ms. Rhonda Biss. You may proceed. Thank you. May it please the Court, my name is Rhonda Biss and I represent Cheryl Veile. This case is rather fact intensive, so I'm going to try to pare the facts down to those that I think are crucial for determination on appeal. The parties, Cheryl and Roger, were married in 1984. At the time of the trial, they had a 28-year marriage. Their daughter, Tiffany Jean, was born in 1992. Between 1984 and 1992, Cheryl held a job outside the home with the Red Cross, and then she went to work in Roger's family business, Veile Construction. Veile Construction was initially a contracting, developing type of business that ultimately evolved into a mobile home park, which was its main asset, and became known as Arapahoe Village, Inc. Cheryl was 56 at time of trial, and Roger was 57. Cheryl had a high school education. Her experience outside of the home was very limited. When we went to trial in June of 2012, Cheryl had previously worked as a bus driver, and at the time of trial, was working for Memorial Hospital in housekeeping. Your Honors, Cheryl is a very unsophisticated woman. Her life revolved around her home, her child, and she depended upon her husband, Roger, to take care of the business aspects, to take care of the money, and that is what Roger did. In contrast to Cheryl, Roger was a civil engineer. He is also a licensed professional engineer. He obtained his license after 10 years into the marriage. Roger, however, devoted very little of his time to pursuits through his civil engineering business, which he created as Veile Engineering. Veile Engineering was Roger's business. He didn't employ anyone outside of himself, and he actually used this business to perform work for his family's company, which was Veile Construction, and ultimately became Arapahoe Village, Inc. As the Court will see, during the years, the 28 years that the parties were married, Roger had very little income attributed to anything other than his work or his family's business. To back up just a little bit, in 1990, the senior Veiles, Donald and Ora May, who had started Veile Construction, gifted shares of stock, one-third of all shares of stock, to Roger Veile. This was during the parties' marriage. They had been married for approximately six, seven years. The gift of stock to Roger constituted 33.08% of the total stock. Ora May and Donald maintained two-thirds of the stock. Then, in 1993, what had been Veile Construction was changed into Arapahoe Village, Inc., and as I already told you, its main asset was a mobile home park that Roger helped develop and ultimately took control of. The testimony was undisputed, and Roger was very proud of the fact, and should have been, that what he did was take a mobile home park worth relatively little money and turn it into what, in 2006, turned out to be a $4 million asset. It was due to Roger's management, Roger's foresight, Roger's ability to negotiate and take care of business. And during trial, his father was subpoenaed, and his father, when asked about Roger's efforts in turning this asset into what it became, said, well, I don't know about what he did, but I know about the result. And the result was a $4 million asset built over the years, over the years that he was married to my client. During the time that the company was starting to thrive and build, Cheryl, for the most part unbeknownst to Cheryl, who was at home with her child, was being included as officers of the corporation. She was on the board of directors. She was involved in ways that she didn't understand, but she knew that she was being used to take care of the family business. At one point, Cheryl's name was put on the accounts that Arapahoe Village Inc. used to hold its retained earnings. When we started trial in this case, neither Cheryl or I were aware that Cheryl had actually been put on those accounts. And as you will see, I've asked the court, this court, to reverse the court's determination that sanctions should not have been awarded for discovery abuses. Based on the fact that at the time we started trial and a couple of days into trial, we were not given any of the documents to show that Cheryl was indeed a co-owner of those Arapahoe Village accounts. And to identify these specific, the accounts at issue are the fidelity accounts ending in 468 and 869. These accounts were created as the business began to prosper to hold retained earnings, as I said. But once the business sold in 2006, Arapahoe Village Inc., because the mobile home park had been sold, was virtually nothing but retained earnings. Now, and as I understand it, the president, Roger, had the ability and control to move all of the retained earnings whenever he wanted. That's true. He took withdrawals. He didn't have to ask his parents to do that and funded his marriage through the withdrawals from Arapahoe Village. Is that true? That is correct, Your Honor. All right. And the trial dates were set several times, as I understand. They were. And one trial date was in May, and your brief indicates that seven days before trial, Roger produced one monthly combined account statement for 331-11? That's correct. Did that have to do with the fidelity accounts? It did. Did her name appear on it? That's the only time that her name did appear. I received... So that was seven days before the May trial. That's correct. And then three days before trial, you got, as you recall, disjointed documents. What does that mean? It means that they were not in the order that they would normally be kept in business. Which Rule 214 requires. Correct. I asked Roger Biley about that at trial, and Roger responded that I produced them in the way I kept them in my ordinary course of business. I produced them to my counsel that way. I don't know what was done with them after I produced them to counsel. And, Your Honor, to further expand on disjointed, there would be pieces of a statement from February of 2011, for example, combined with pages from a statement from another month, maybe another year. It took hours to go back through these documents and try to put them together and make sense of what had gone on. But what I would like for the Court to know is that it was days before trial when I realized that in some capacity, because one sheet of paper had been, I think, inadvertently produced that showed Cheryl Biley's name. In some capacity had been on those accounts. Her name was listed at the bottom of a summary of accounts, along with Donald Biley and Roger Biley's name. At that point in time, I went to the trial court and asked for leave to subpoena documents, because in Roger's answers to interrogatories, he had denied co-ownership of any of these accounts with anyone. And he had also, at trial, denied that Cheryl had any ownership and interest in these accounts. So when it became apparent to me that in some capacity she was on them, I asked the Court for leave after trial to subpoena Fidelity directly, because I had gotten nowhere with normal discovery procedures. The subpoena process took until October. We tried this case in June. It was until October that I finally got the documents. June of what year? 12. But the first trial was set in 11. That's true, Your Honor. And then, as I understood it, there was a discovery cutoff of November 10, 2011. There was. And a new trial date in December. Correct. But then again in December, four days before trial, you got some corporate minutes of Arapahoe? Correct. And that was after the discovery cutoff? It was. Did that cause a continuance of the trial? It did. In fact, all the continuances were due to late discovery, me getting maybe 500 documents dumped on me a few days before the trial date. This went on and on. As you can see, there were numerous continuances. And every time I had to go to the Court and ask for time to look at the documents that had been given to me. Interestingly enough, during the trial, Roger had, in one response to my discovery, said that he didn't have the Fidelity originating documents, that he couldn't produce them because it would be too costly to get them from Fidelity. And I cite to this in my brief. However, he, on the second day of trial, shows up with a box of manual documents and testifies at trial that these are the Fidelity documents from 1999 through 2005. So he had all of those documents in his possession the entire time and never produced them to me until he did that day of trial in a box. Ms. Fiss? Yes, ma'am. Do you know how it came about that her name was removed from the account? I do. I do. In January and February, Roger and his father passed a corporate resolution to take Cheryl's name off of the account. And they did so based upon a position statement. Cheryl, at one point in time, thought that they had had her sign paperwork resigning her position as an officer of the corporation. And she had told me that. So in my position statement, I put in there that she had resigned her position. Well, they took that position statement, which is not evidence, not documents, just our position for purposes of alerting the court to what issues need to be tried. They took that, sent it to Fidelity with the resolution taking her off the accounts, and Fidelity, I guess assuming that it was appropriate, took her name off the accounts two months before we went to trial in this case. I found that out based on Roger's own testimony during trial. I guess, to put it bluntly, Your Honors, I feel like I found the smoking gun in this case through my post-trial subpoenas. Were you allowed any more hearings? I was not. Documents were allowed in or not in, but no more hearings? I was not. Evidence was not allowed to be reopened? Evidence was only reopened to the extent that I was allowed to admit those documents as evidence in the case. Do you believe that more testimony would have been helpful? I absolutely do. Once I found that smoking gun, as I would like to call it, it is the 4 April 19, 2006 document that Roger had Cheryl sign, naming her co-owner of the accounts 468 and 869. This is more significant in light of the fact that the date he had he signed her on as co-owner of those accounts, Roger knew that the property, Red Hill Village, Inc., was going to sell two months later for about $4 million and that the retained earnings, the almost $4 million that was going to be left after they paid off their expenses, were going to be dumped in those accounts. He absolutely intended for her to be co-owner of that money. And he even testified at trial when I asked him, you know, well, did you have an intention for her to be able to use the money? And he said, well, in the event of an emergency, I wanted her to be able to write checks. I wanted her to be able to get the things she needed. So he intended for her. He gifted that money to her. If the court believes that his share of stuff, representing his part of the retained earnings, was non-marital at some point, he certainly, in 2006, when he had her sign on as co-owner, with the right to take every dime out of that account and use it for herself, intended to give that to her. Not only that, the case law in Illinois is quite clear. You can't use retained earnings to defeat a spouse's right to what otherwise would be marital property. And the cases that address this consistently hold that if retained earnings are the result of the personal efforts of a spouse, then that spouse who wants to claim that they maintain their non-marital status has the burden of proof, by clear and convincing evidence, to prove to the court that the personal efforts, that his, in this case, personal efforts did not result in this marital asset. Roger didn't come anywhere near it. In fact, he offered very little evidence. And I guess his father didn't as well. His father. His father, and this goes to another issue. Go ahead and finish that. Thank you. This goes to another issue, Your Honor. His father virtually didn't even know what was going on. They're very elderly, and Donald didn't even know who was officers of the corporation at time of trial. So, truth be told, Roger had controlled this business for years. His father just let him have it and do what he would with it, which included large distributions that he took. And incidentally, he took $397,000, I believe it was, in 2008, put it in his own Fisher Fidelity account, which is one of the things we're asking to be equitably divided at the end of the day. Okay. You'll have additional time at the end of Mr. Wells. Thank you. Mr. Wells, we'll give you the benefit of the additional time if you need it. Thank you. Mr. Bissett. Go ahead. May it please the Court? Ms. Bissett. I think this case can be distilled down to five words. Those five words that I'll give you and explain the reason for them are procedure, statute, fiduciary, candor, and deference. There have been some comments made today that I am deeply troubled by, and I'll get into that as we proceed. The first one I use is procedure. I tried to, in my brief, set forth the procedure of this case and the procedural status of this case. The procedural status of this case was that there were pleadings that were filed. Now, one of the things that's kind of interesting is that the one rule that is not cited by anybody, and never really is controlled in this case, is Supreme Court Rule 1. And the reason it's not cited is it's somewhat self-evident. Supreme Court Rule 1 says that the procedural rules and Supreme Court rules all apply to all the cases unless there is a substantive law that has an exception to those rules, meaning we're all required to follow those procedures and those rules. They don't apply to a civil case and not to a divorce case, dissolution case. They apply to all of them. Now, what's procedure? Procedure comes in three forms. It comes in the form of the code of civil procedure. It comes in the form of Supreme Court rules. And it comes by reason of the code of professional conduct. The procedure in this case says you start with pleadings. Why do we start with pleadings? The very simple reason we start with pleadings is so that everyone knows what is being alleged and what is being challenged in the case. In this case, Roger Biley filed affirmative defenses to the pleadings. There was never a response to this. You know, I'm interested in your use of the word affirmative defenses because affirmative defense, a true affirmative defense, admits what the other party is complaining of, right? But under some affirmative matter, destroys the ability of the person to bring it. So, for example, a statute of limitations or ledgers. So which affirmative defense do you claim was pled? The non-marital property? Yes, ma'am. How does that admit their pleading is valid and then somehow destroy validity of it? It extracts out from their pleading their request for the division of all the property. It extracts out from their pleading their responsibility to say this is part of what the court is there to define. The procedure was there. It was also there. So that puts the parties at issue, really. It puts the parties at issue with reference to that if there's a denial of that affirmative defense, which it was never done. There also was a counterclaim that was filed, and the counterclaim also alleged this as non-marital property, which was not denied for 297 days and did not get denied until the start of trial and was denied without any leave of court with reference to the denial. The pleading was allowed to be filed. The pleading was filed. There was never any allowing it to be filed. It was filed. Did you file a motion to strike it? Your Honor, that pleading was given to me. Did you file a motion to strike it? No, I did not. Did you ever file a motion for default or summary judgment on your pleading that had not been responded to? Your Honor, at the time of the motion for summary judgment, there had been no response to our counterclaim. So at the time of the granting of the partial summary judgment with reference to this matter, there had been requests for admissions that had been filed. There had been an admission that it had been a gift at that time with reference to the stock that existed in the company, and there was also the fact that Roger had an undisputed affidavit that was of record at the time that was done. Together with the fact there had not been a response to the other aspect. And yet the court didn't fully grant your motion. It granted the motion with reference to the stock. Only as to the stock. As to the stock, which was the interest in Arapahoe Village. Right. Do you think that discovery had been complete by the time you filed your motions? Yes, Your Honor. And what led to all the documents after that? I was curious about that. Okay, let's deal with the issue concerning discovery, Your Honor, because it's very important. And it's so important that I included in my brief, in the appendix, all the documents which we produced. I also would give the court reference to the findings of the trial court, in which the trial court found that those documents were not only produced with reference to what we gave in discovery, but were available in numerical residence throughout these proceedings, available with a photocopy machine available. And the record also shows that what did Mrs. Riley say? She said, I copied whatever I thought I wanted to. So she had access to that. As a matter of fact, there were points in time where she had access to those records. My client wasn't even living in the house. The records were left behind for that to happen. So you think Mrs. Riley was a sophisticated participant to the point where she would regularly review the fidelity accounts and knew exactly what to copy based on her education and experience and participation in the marriage? The answer to the question, I think, would be a qualified no. So I saw the court put a lot of emphasis on her ability to get the records, and I'm thinking that what you just said is true. She's not a very sophisticated woman, at least according to the information I have. Here are some of the elements that I think that you're dealing with. Because the whole issue of this is the comment of the smoking gun. There is a smoking gun that is allegedly given. Your Honor, I put the alleged smoking gun, a copy of it, in my brief. And what does that smoking gun show? And you'll find it on page—I apologize. I'm going to have to put my glasses out. It's exhibit U, and it's on page A43. And this is what it says. It says, authorized signature of owner. Okay, under that, what does it say in parens? Or trustee, or authorized custodian. That's how this account was opened up. It was never opened up as an ownership account. It's opened up in the name of Arapaho Village. It has Arapaho Village's tax identification number. And what else does it have here? It has Donald Violet signing as secretary of the corporation. Your Honor, we have termed corporate law on its head with reference to this argument. So much so that I believe that there is some disingenuousness, as far as the comments made, that she was made a co-owner of this account. She was never made a co-owner of this account. I don't see your argument here on this page. It says she's a co-owner. It says— It says co-owner. It says, or trustee, or authorized person, or custodian. But it's in the alternative. It is, Your Honor. But look at the first page of that document. One page. Page 42 of the attendance. And what is there? Arapaho Village, Inc. Customer information. Arapaho Village, Inc. Tax identification number was used by— Well, there's no doubt that that was an account that was used to hold this money, is there? There's no question that it was owned by Arapaho Village. And Arapaho Village was an asset that my client, by reason of an admission, was the owner of a 33% interest of. He was not in control of this. And the comment that was made to this Court that he had the right to make distributions without the permission of his parents is flat-out wrong. It didn't happen. It didn't occur. But he did take distributions. No, Your Honor, he did not. That's a misnomer. What happened was he received distributions, and there's a big difference between those two. I receive distributions and dividends from a company that pays me, but I don't make those determinations. He had an interest in that company, but not a controlling interest in that company. That interest was controlled by his parents. But he was president of the company. He was president of the company. His parents were elderly. President of the company does not give you the authority to do it. I understand, but who made the withdrawals? Did he to fund the marriage? No, Your Honor. He received withdrawals throughout the course of the marriage as they were distributed to each other shareholder. There is no showing that he ever received distributions that weren't authorized by his parents, the majority shareholders. There is no evidence to show that the amount that he received was received by him and wasn't received by the other shareholders. He received his proportionate share of the interest in that company. What was he earning during this period of time as a salary? In which company? In Arapahoe. Your Honor, the arrangement generally was that Arapahoe Village paid to Violet Engineering compensation for his services. So it was fairly nominal. No, no, it wasn't nominal, Your Honor. It ranged, I think, generally for about $48,000 to $60,000 a year. Because during that period of time, what he was doing was he was managing the local home park. And that's another thing I want to make sure. I would think a civil engineer could earn considerably more than $44,000 or $48,000. Your Honor, there was record before this court, there's an exhibit in the file that shows you the efforts that he made to try to find other employment after his employment with Arapahoe Village waned. When Arapahoe Village was sold, the mobile home park was sold, he made extensive efforts to go out there. His age, the fact that he had really been involved in managing a mobile home park rather than civil engineering all those years, he himself had, by reason of the circumstances, had been found really to make himself antiquated with reference to a skill level. And trying to get back in the job market hurt him as much as anyone with reference to what was going on. I read that argument. But then I also read he put himself on unemployment in 2010. How are you making every effort to get your job back and your professional engineer license updated, and then you're going through a divorce and you put yourself on unemployment so you only draw $200 a week? I think the response to that, and you can get into the moral issue of that, but the legal issue is this. What happened? No, it didn't, Your Honor. What I do, I don't know what I do under the circumstances. But the circumstances he was facing was this. His job had changed from making $40,000 to $60,000 a year to making $6,000 a year because he no longer managed the mobile home park. Instead, he was tasked with managing the money. And he was paying himself or the company was paying him a 2% return with reference to that. On the fidelity account? On managing the fidelity account. Which if you look around, that's not a fair return for somebody as an investment advisor. So the compensation there was a fair compensation for his parents for that. But I have to return this one point if I may, and that is management. He managed the mobile home park. The comment was made before this court that he developed that mobile home park, that he is the one by his acumen and by his effort made that mobile home park for what it was today. Your Honor, the evidence is clear. That mobile home park was developed when he was in grade school. That mobile home park, all the pads in that mobile home park existed before that time. There is no evidence in the record concerning any effort of him to develop that park, to expand that park, to increase the infrastructure of that park. As pointed out to this court in my brief, unfortunately I had to present it here. My reason of judicial notice was information concerning what it takes to put a mobile home park together. And the reason for this is because I was confronted with multiple positions in this case. The first position we got in this case with reference to this stock in Arapahoe Village was that Charlotte Viley was given this stock by Roger's parents. That was the first position. Well, we had to deal with that, and we did. We dealt with that, and we had it shown that they did. Not only did we show it by reason or testimony, we got the tax returns, the gift tax returns that were then filed to show that they were gifted to Roger. Okay, well, but she's already done in a request for admission that this was a gift, so that was a trial. We have that. I understand. That was the first point. The second point was that Cheryl Viley provided the wherewithal to make this company what it was. Well, you've heard today before you on a sophisticated person, a person that... Somebody saying Cheryl Viley made the company? Yes. With a position statement, Your Honor. Cheryl Viley's efforts made this company what it was. We confronted that. We confronted that allegation with reference to it. It was confronted by a father. It was confronted by a corporate attorney and a corporate accountant as far as the fact of what she did or didn't do. And today you heard the fact that she was on the company and didn't really know why she was on the company. The emergency she was on the company for was this. If no one else was available to sign something for the company, she would be in a position as a vice president to sign what might be necessary in order to get the funds out of Fidelity Investment. Never was she given that. Never was she put as a co-owner on that account. I want to go back and ask you about that because you put in your brief that on November 9th... I'm sorry, December 9th, you produced a document that established that Cheryl was given access to the Fidelity accounts through the corporate minutes in February of 1998. Your Honor? My question first of all is, was this the first time that you gave the corporate minutes that revealed this information to Cheryl's counsel? I apologize for not looking at my brief. What was the date you gave me? Page 35. No, no, the date you gave me for the brief. The date was December 9th according to your brief that you produced the document. That document was produced six months before the trial in this case. It was produced after the discovery cutoff. The discovery cutoff was, because of the late production in May, I believe was November of 2011. November 10th of 2011, the court said the discovery cutoff. You responded on December 9th, just a few days before the trial setting, and I think I'm correct that what you're arguing here on this page is this was the first time that Cheryl was given access to this paper that was shown she was given access to the Fidelity accounts. Mr. Wells, I don't believe you would violate discovery rules like this because as you said, these rules are law. They're orders. The 14th is an order. Actually, the issue concerning that, Your Honor, was when the request was made for the production of the documents that were produced. Your Honor, if you look at the Appellee's brief in page 9 of Appellee's brief, it says from 1998 forward, Cheryl was an officer at Arapahoe Village and was authorized to trade within the investment account. She knew that. She had that. She says in her position statement that she had that position with the company. The fact was that the information concerning these Fidelity accounts were produced and the accounting question, the Fidelity accounting question was produced multiple times before that time right before trial. Those were updated financial statements from Fidelity. Not many people do this. I didn't get this back from the opposing counsel. What I did was I gave those more recent statements, which came in May of 2012, shortly before trial, which was in June. I gave those statements up. I gave the year-end statements because we didn't have the year-end statement when I made my response in January. So I made my efforts to do that. And those accounts all were of the same elder, and that was Arapahoe Village owned this account. She was an authorized person as far as access to this account. She had direct access to this account. One more question. During trial, Ms. Viz represented there was a box of documents produced. Yes, ma'am. By your client. Had those ever been produced before trial? Your Honor, those documents were part of a set of documents that I have a letter from January of 2012 in which I said there were additional documents that were available in my office for inspection if you wish to review them. Those documents were statements from the Fidelity account concerning Arapahoe Village. They don't add any light with reference to this information. They don't have the document that is appended to brief because we did not have that document. That document was produced by reason of this affidavit to Fidelity. But again, that document, which is this smoking gun, is an account which is in the name of the corporation. We have laws that say that corporations are separate and distinct. I hate to agree with any court that says they're people or persons, but that's the way the law reads, and that's the way the case was situated. Never and never could Roger make her a co-owner of that account. Roger Bilek did not have the authority to do that. The word I was going to tell you that I wanted to give you the definition of, and I think you're wrong, fiduciary. There was a fiduciary relationship that existed there, a trust relationship. And to do what was suggested in this court that Roger Bilek did would have him steal from his parents and the other shareholders of that business because he had no right to take that. Thank you. Okay, thank you very much, Mr. Wells. You're welcome. Ms. Vest, do you have anything else? I do. Ms. Vest. I would like to clarify because, quite frankly, the page that Mr. Wells referred to from the, for lack of a better term, the smoking gun, upon question from the court, he directed your attention to a page that simply says there's a- Could you give us the page again? Yes. In my brief, it's Appendix 109, and it was Petitioner's Trial Exhibit 28 at trial. It is the authorization, that's the title of it. Have you found it? No. Okay. But I'll listen. Okay. It is the authorization for Cheryl Bilek to do the following from the funds contained within the Arafaho Village account. Redemptions by me, distributions payable to me, or to secure payments of amounts to be invested by me. Under all of that language, it says signature of owner. Under that, Roger Bilek's signature appears. To the right of that, it says signature of co-owner. Cheryl Bilek's signature appears. There is, unless we are denying the very meaning of these words, Cheryl Bilek was given ownership of the money held, the retained earnings held in the Arafaho Village account. Now, I am not trying to suggest that we convert two-thirds of it that belonged to his parents. I am merely saying that what was Roger's in that account was also Cheryl's. By declaration of Roger himself. And if that weren't enough, let's talk about disingenuousness. To suggest that our position as the court to convert money unbeknownst and in breach of duty to the corporation, right below those very signatures is the signature of Donald Viley, the very person who had controlled this business during its inception and who authorized her to be put on this account as a co-owner. That's what it says. She could have drained this account, taken every penny, and done so legally. So, we must recognize that Roger at the very least intended a gift. And irony happens in the strangest of places because he didn't produce these documents and they were discovered post-trial. Roger didn't think he had the need to rebut a gift. The gift that he made to Cheryl because he hadn't disclosed it, the documents hadn't been produced, and the court only allowed me time to submit the evidence that I had obtained as to the co-ownership. As a result, Roger got bitten by his own failure to disclose because he did not present evidence at trial to rebut the presumption of the gift that is clear on this document. Therefore, he must, the court should be reversed on the issue of whether the sums were gifted. His sums, his portion of those retained earnings were gifted to Cheryl. And if there's any doubt about whether the personal efforts of Roger resulted in this $4 million windfall, I would like to clarify. Mr. Wells kind of skated over that and said, well, he was making $48,000 to $60,000. What happened was immediately after he put Cheryl on as co-owner and the sale took place, Roger dropped his income to $6,000 a year, $12,000 a year. He simply, you know, he never, they never relied on his income in wages as an engineer or whatever through filing engineering. They lived off of those distributions from Arapahoe Village, Inc. They had a $65,000 quote. That's more than Roger was making in one year at his best year working through salary. They had a $269,000 house. Cheryl testified she could go out and buy whatever she wanted. They funded their daughter's college education account to a degree. Clearly, clearly, Roger Byers should not be able to take advantage of this untenable position that the sons that he decided to hold that were really his income. And the case law addresses that. You retainers are meant to shore up corporations. They are meant to pay expenses. They're retained for the purpose of funding the corporation. There was nothing left to fund. Arapahoe Village was gone. Let me ask you one question just as a matter of procedure. Neither party today has argued the issue of maintenance or the issue of Tiffany Biley. I assume you're not waiving those issues. Your Honor, I am not. I ran out of time, but I ask that the Court consider those. Okay. Okay. Thank you very much. Thank you very much. Thank you. We take the matter under advisement and issue an opinion, hopefully, in the near future. And with that, the Court will be in adjournment.